UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JSHONTELLE CHALK,
                    Plaintiff,

          v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
                    Defendant.
_____

**DECISION & ORDER**
16-cv-6494

## Preliminary Statement

Plaintiff Jshontelle Chalk ("plaintiff" or "Chalk")[1] brings this action pursuant to Title II of the Social Security Act seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. See Complaint (Docket # 1). Presently before the Court are competing motions for judgment on the pleadings. See Docket ## 10, 17. Plaintiff's motion to consider new precedent (Docket # 20) is **granted**. For the reasons that follow, plaintiff's motion for judgment on the pleadings (Docket # 10) is **granted**, the Commissioner's motion for judgment on the pleadings (Docket # 17) is **denied**, and the case is remanded for calculation and payment of benefits.

---

[1] Plaintiff proceeded as "Jshontelle Rollins" in a previous Social Security proceeding before this Court.

1

## Background and Procedural History

On August 12, 2011, plaintiff applied for disability insurance benefits. Administrative Record ("AR") at 131—32. On October 19, 2011, plaintiff received a Notice of Disapproved Claim. AR at 36-59. Plaintiff timely filed a request for a hearing before an administrative law judge. AR at 71—72. On February 7, 2013, Administrative Law Judge John P. Ramos (the "ALJ") held a hearing.[2] AR at 97—138. Plaintiff appeared at the hearing with her attorney, Richard Mihalkovic. Id. On March 7, 2013, the ALJ issued a decision, therein determining that claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. AR at 13—22. On March 13, 2013, plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council. AR at 8—9. On March 21, 2014, the Appeals Council refused to review the ALJ's decision, making the ALJ's decision the final decision of the defendant Commissioner. AR at 1—7. The plaintiff then filed a federal lawsuit.

In a decision dated September 28, 2015, this Court remanded the case to the Commissioner for further proceedings. I determined that the ALJ erred in finding that plaintiff's mental impairments did not meet the threshold of a severe impairment. AR at 791. I further determined that this error was not harmless because

---

[2] A hearing originally scheduled for November 15, 2012 was adjourned to this date for plaintiff to obtain representation. See AR at 29—35.

"[p]laintiff's pain from her exertional limitations also affects her ability to work and should have been included in the RFC" but that the ALJ rejected such limitations. AR at 794. In turn, the Appeals Council remanded the case to the ALJ. AR at 797-99.

The ALJ held another hearing on March 15, 2016, at which the plaintiff, represented by counsel, and vocational expert Christine Detrico (the "VE"), testified. AR at 689-713. On May 3, 2016, the ALJ issued a decision finding that plaintiff was not disabled. AR at 660-72. Plaintiff did not appeal the decision to the Appeals Council, so the ALJ's decision became the final decision of the Commissioner on July 3, 2016. See AR at 658. Plaintiff commenced this action on July 15, 2016 (see Docket # 1), and filed her motion for judgement on the pleadings on January 4, 2017 (see Docket # 10). The Commissioner filed her motion for judgment on the pleadings on May 4, 2017. See Docket # 17. Plaintiff did not reply, but did file a motion to request that the Court consider new Second Circuit precedent (Docket # 20), which, the Court now grants. The Court heard oral argument on July 7, 2017. See Docket # 25.

## Medical History

Evidence Included in Previous Appeal: Plaintiff was involved in a motor vehicle accident on June 24, 2011, and was admitted to Arnot Ogden Medical Center. AR at 368. CT scans showed plaintiff suffered from a nondisplaced fracture of the posterior ring of C1

3

on the left side and mild degree of compression of the superior endplate of L1 with no retropulsed fragment. AR at 396.

Plaintiff presented to Dr. Andusko on July 25, 2011, at the Southern New York Neurosurgical Group for a follow-up appointment after her motor vehicle accident. AR at 295. Plaintiff complained of headaches, neck pain, bilateral shoulder pain, low back pain, bilateral hip pain, and numbness in her hands and feet. Id. Dr. Andusko observed the plaintiff's nondisplaced left-sided posterior arch C1 fracture and a mild compression fracture of her superior endplate of L1. AR at 296. Dr. Andusko recommended repeat imaging of the L1 compression fracture, physical therapy, and continued use of a cervical collar. Id.

A CT scan performed on July 28, 2011, revealed discontinuity of the posterior ring of C1, without change from the previous study, indicating that the finding may be congenital or the result of an old injury. AR at 456.

On August 8, 2011, plaintiff presented to Dr. Bajwa for pain in her right hip. AR at 294. Dr. Bajwa observed that plaintiff had an antalgic gait favoring her right leg, a fracture of posterior arch of C1, and a fracture of her superior end plate of L1. AR at 294. He recommended plaintiff undergo an MRI of the lumbosacral spine. Id.

Plaintiff underwent an MRI of her back on September 19, 2011. Although plaintiff's discs were normal, there was a mild

4

compression fracture at L1. There was no bone destruction and her joints were normal, and there was no large disc bulge or herniation. AR at 455.

On September 20, 2011, plaintiff saw Dr. Joseph Garrehy and complained of excruciating lower back pain. AR at 363. Dr. Garrehy noted her gait was steady and stable, and she demonstrated 5/5 strength in both lower extremities. Id. Plaintiff's cervical spine was limited in range of motion. Id. Dr. Garrehy reviewed plaintiff's MRI scans and noted the C1 possible fracture was most likely congenital or an old fracture. Id. The MRI of the plaintiff's lumbar spine noted a healing L1 fracture. Id. Dr. Garrehy proposed sending the plaintiff to physical therapy and pain management. Id. He did not find surgery to be necessary. Id.

Plaintiff presented to Dr. Look Persaud on October 5, 2011, at Industrial Medicine Associates for an orthopedic examination. AR at 297. On that date, plaintiff was taking Percocet, Flexeril, Cymbalta, Celexa, Docusate, Ambien, and Lupron. AR at 298. Plaintiff reported cooking once or twice a week and doing laundry and shopping once a week. Id. She helped with child-care but needed assistance getting in and out of the shower and putting on clothes. Id. Plaintiff's daily activities included watching television, listening to the radio, reading, and visiting her grandparents. Id. Ultimately, Dr. Persaud diagnosed plaintiff

with residual neck pain from a fractured C1 vertebra and low back pain with fractured superior end plate of L1 with possible soft tissue injury to low back. AR at 300. Dr. Persaud determined that the plaintiff had no restrictions in her ability to sit or stand, but she had moderate restriction from walking on uneven terrain or up inclines, ramps, and stairs. Id. Plaintiff also had a moderate to marked restriction from squatting, kneeling, and crawling, and for lifting, carrying, pushing, and pulling. Id. She had a mild restriction for reaching overhead and no restriction for reaching other places. Id.

The same day, plaintiff saw Dr. Sara Long for a psychiatric evaluation. AR at 302. Dr. Long noted the plaintiff had no previous psychiatric hospitalizations or current treatment but did receive outpatient treatment from March 2011 through June 2011. Id. Plaintiff complained of a loss of appetite and difficulties sleeping, which she attributed to back pain. AR at 303. Dr. Long opined that plaintiff was able to follow and understand simple directions and instructions and perform simple tasks independently. AR at 304. She was able to maintain attention, concentration, and a regular schedule, and could learn new tasks, perform complex tasks, make appropriate decisions, and relate adequately to others. AR at 310. Dr. Long noted the plaintiff's evaluation was consistent with stress related problems, and that alone would not be significant enough to interfere with her ability

6

to function on a regular basis. AR at 304. Dr. Long recommended stress management. AR at 305.

T. Harding, a psychologist, examined plaintiff's medical records on October 17, 2011. AR at 306. Dr. Harding determined plaintiff had no medically determinable impairment. Id.

Plaintiff presented to Dr. Fang at Comprehensive Pain Relief on November 23, 2011. AR at 517. Dr. Fang reported that plaintiff's pain was in her back and neck and was radiating into her arms and down her legs. Id. Dr. Fang also noted plaintiff was positive for anxiety, depression, dizziness, headache, memory impairment, and psychiatric symptoms, but plaintiff appeared to be in no acute distress. AR at 518-19.

Plaintiff reported to physical therapy with Michal Niedzielski, PT PRC, on November 29, 2011. The evaluation revealed "severely decreased trunk rotation bilaterally right more than left, decreased apical expansion of both chest walls of the contralateral lower ribs opposition." AR at 932. Physical Therapist Niedzielski also observed a decreased cervical rotation, bidirectional instability of both humeral glenoid joints, a midline shift, and "severely increased muscular tone in the cervical, lumbar and diaphragmic areas." AR at 932. Plaintiff reported again for physical therapy on December 6, 2011 (AR at 933), January 18, 2012 (AR at 934), February 6, 2012 (AR at 935), February 27, 2012 (AR at 936), February 29, 2012 (AR at 937), March

7

1, 2012 (AR at 938), March 5, 2012 (AR at 939), March 7, 2012 (AR at 940), and March 15, 2012 (AR at 941). Although plaintiff reported significantly decreased pain in the cervical spine after the February 6, 2012 treatment (AR at 935), Physical Therapist Niedzielski observed that plaintiff continued to have difficulty alternating movement (AR at 933), had "significant hypertonicity in the paraspinal musculature" (AR at 934), had significantly decreased vision in the left eye and decreased balance (AR at 936-37), had strong partial influences on her rib cage mechanics (AR at 938), and had increased swelling, muscular tone (AR at 940), and sensitivity to touch (AR at 941).

On December 6, 2011, plaintiff returned to Dr. Bajwa for a re-evaluation. AR at 362. She was experiencing dull and aching pain in the lower lumbar region and significant headaches. Id. Dr. Bajwa ordered an MRI scan of the brain, and recommended continuing physical therapy. Id.

Plaintiff presented to Dr. Andusko on January 17, 2012. AR at 361. Dr. Andusko noted the plaintiff's cervical range of motion was "a bit restricted." AR at 361. He also noted the lumbar area was tender, and lumbar range of motion was a bit painful. Id. Again, plaintiff's lower extremities had good strength and sensation. Id. Dr. Andusko determined that plaintiff's symptoms rendered her unable to return to work pending a follow-up visit. Id.

8

Plaintiff went to physical therapy on January 18, 2012. AR at 612. It was noted that she had significant hypertonicity in the paraspinal musculature. Id. Plaintiff again attended physical therapy on February 6, 2012. Id. Her physical therapist assessed the MRI and x-ray results, noting that plaintiff's MRI revealed left rotation of the lower lumbar spine with multiple bulging in the lower back. AR at 613. After treatment, he noted there was significantly decreased pain in the cervical spine. Id. On February 27, 2012, plaintiff's physical therapist began observing vision difficulties that caused plaintiff to lose her balance. AR at 614. On March 7, 2012, there was possible increased swelling and increased muscular tone paraspinal muscles. AR at 618. On March 15, 2012, plaintiff's physical therapy was placed on hold until she saw an optometrist. AR at 619.

Plaintiff began mental health treatment at Family Services of Chemung County before her car accident in January 2011 at the encouragement of her probation officer. AR at 520. At her initial visit, she reported feelings of anxiety and trouble sleeping due to being on probation for welfare fraud, previous back injuries, and the stresses of being a mother and attending school. Id. Plaintiff continued treatment until her car accident on June 24, 2011. She returned to counseling on February 21, 2012, with feelings of anxiety, depression, and irritability, exacerbated by her accident. AR at 547. At her initial visit back at Family

9

Services, a mental evaluation was taken by Amanda Pelcher. AR at 547—53. Plaintiff was noted to be well-orientated, alert, had appropriate affect and euthymic mood, and was well-dressed and neatly groomed. AR at 550. Plaintiff also exhibited good eye contact, logical and coherent speech, was goal-directed, and showed no memory problems. Id. Plaintiff did exhibit a negligible degree of conceptual disorganization. Id. She was diagnosed with adjustment disorder with mixed anxiety and depressed mood, and post-traumatic stress disorder. Id.

Plaintiff again attended Family Services of Chemung County on February 27, 2012. AR at 554. During this visit, plaintiff reported feeling increased levels of stress and anxiety, chronic pain, and depressive symptoms. Id. Her therapist assigned homework to cope with anxiety, such as watching TV, taking a bath, sleeping, and journaling. Id.

On April 19, 2012, plaintiff returned to the Southern New York Neurosurgical Group following an emergency room visit on April 8, 2012. AR at 360. Plaintiff described worsening lower back pain that had spread into both legs. Id. Plaintiff reported "significant numbness in the bottom of the feet," and she felt "like she is walking on a numb surface." Id. Dr. Bajwa observed plaintiff walking with significant antalgic gait, appearing to be in distress. Id. Dr. Bajwa encouraged continued pain management,

10

and he ordered another MRI scan of the plaintiff's lumbosacral spine. Id.

She saw Dr. Bajwa again on July 19, 2012, where they reviewed an MRI scan of her lumbosacral spine. The MRI showed a "slight bulging disc minimal at L3-5, L5-S1 but no clear herniation or compression." AR at 499.

Plaintiff presented to Dr. Povanda on November 7, 2012 for a Medical Source Statement of Ability to do Work-Related Activities (Physical). AR at 501–06. Dr. Povanda determined plaintiff could lift or carry up to ten pounds frequently, eleven to twenty pounds occasionally, and twenty-one to fifty pounds occasionally. AR at 501. Dr. Povanda also reported plaintiff could sit for two hours, stand for one hour, and walk for one hour at one time without interruption. AR at 502. She could sit for four hours, stand for two hours, and walk for two hours in an eight-hour work day. Id. Using both hands, plaintiff could reach overhead occasionally and reach all other ways frequently. AR at 503. Dr. Povanda reported plaintiff could never climb stairs, ramps, ladders, or scaffolds, and she could never stoop, crouch, or crawl. AR at 504. Plaintiff could occasionally balance and kneel. Id. Plaintiff had no significant environmental limitations. AR at 505.

On December 31, 2012, plaintiff was discharged from Family Services of Chemung County. AR at 587. Plaintiff's treating

11

therapist left the agency and she was unresponsive to scheduling
an appointment with a new therapist. Id.

On January 21, 2013, plaintiff had an MRI of her lumbar spine.
AR at 621. The results revealed a history of old compression
fracture of L1, but otherwise, the examination had not changed
significantly since the MRI on September 19, 2011. Id.

Dr. Povanda completed a questionnaire on February 5, 2013,
describing plaintiff's limitations. AR at 607—09. According to
Dr. Povanda, plaintiff would need more than one ten-minute rest
period per hour, and her medical condition would result in frequent
absences from work (four or more per month). AR at 607.
Plaintiff's medication would have a mild effect on her ability to
concentrate and keep pace at work. AR at 608. It was determined
plaintiff could sit for approximately four out of eight hours in
a day, and should change positions every thirty minutes. Id.
Plaintiff could stand and walk for approximately two out of eight
hours in a day. Id. She could lift ten pounds for one third of
a working day, and five pounds for two thirds of a working day.
Id.

Plaintiff self-reported to therapist Susan Chalmers, MS, on
May 22, 2013, where she indicated that her anxiety and depression
had become worse in the years since a serious car accident in 2011.
AR at 922. Since then, plaintiff rarely drives, and is instead
transported by her mother. AR at 922-23. Plaintiff reported

12

chronic neck and back pain and a diagnosis of cervical disc disorder, as well as difficulty sleeping. AR at 922. Therapist Chalmers did not believe plaintiff to be a danger to herself. AR at 922. She observed plaintiff to be oriented and alert, with congruent affect but an anxious mood. AR at 924. Plaintiff's recent and remote memory were moderately impaired. AR at 924. Plaintiff's judgment and insight were good, but she had a poor attention span and poor frustration tolerance. Id. Therapist Chalmers diagnosed plaintiff with post-traumatic stress disorder. Id.

Plaintiff again saw Dr. Povanda on May 30, 2013. AR at 623-24. Dr. Povanda opined that plaintiff needed complete freedom to rest while at work. AR at 623. Again, Dr. Povanda believed plaintiff's medical condition would be expected to result in a substantial number of absences from work. Id. The effects of plaintiff's medication would moderately affect her concentration and ability to sustain work pace. Id. Dr. Povanda also reported plaintiff could sit for approximately one hour in an eight-hour day, stand for an hour in an eight-hour day, and should change positions every thirty minutes. AR at 624. Plaintiff could also lift five to ten pounds for three to eight hours per day. Id. Dr. Povanda also noted plaintiff was unable to do any physical labor employment in the future. Id.

13

Evidence Not Included in Previous Appeal: On June 13, 2013, plaintiff saw therapist Angela Jennings, LMSW, where plaintiff recounted feeling frustrated because she has been very limited in what she could do since her accident. AR at 977. She described feeling anxious and having panic attacks, and that a good night of sleep is three hours. Id. Plaintiff reported feeling the same at a June 19, 2013 therapy session, though Therapist Jennings observed that she seemed calm and "engaged really well." AR at 978.

At a therapy session on July 17, 2013, plaintiff reported continued rumination of negative thoughts and that she drove herself to the appointment - something she can do only when she "absolutely HAS to." AR at 981 (emphasis in original). At another therapy session on August 19, 2013, plaintiff was engaged but was very tearful throughout the session and reported not being able to sleep because she could not turn off her mind. AR at 986. Plaintiff presented to a session on September 4, 2013 with a calm mood and affect and shared that many of her problems go back to the accident. AR at 988. Several days later, on September 16, 2013, plaintiff reported keeping busy, which kept her mind off her stress. Therapist Jennings noted that plaintiff was struggling with accepting the way things were "due to the Doctors not telling her anything final, like you'll never be able to do, [sic] x, y and z again." AR at 989.

Plaintiff cancelled or did not show to appointments - though she did call the office ahead of time - on July 3, 2013 (AR at 979), July 11, 2013 (AR at 980), July 24, 2013 (AR at 982), July 29, 2013 (AR at 983), August 8, 2013 (AR at 984), August 14, 2013 (AR at 985), September 3, 2013 (AR at 987), October 1, 2013 (AR at 990), and October 24, 2013 (AR at 991). She was discharged on December 4, 2013. AR at 993.

On August 20, 2014, plaintiff saw Dr. Pedro Gonzalez who diagnosed plaintiff with conjunctivitis and back pain. Plaintiff reported that "with current medications she is stable from her pain." AR at 994. On October 9, 2014, plaintiff again presented to Dr. Gonzalez complaining of lower back pain. He noted "[t]he patient [sic] chronic lower back pain behaves like ReFlex sympathetic dystrophy." AR at 996. Dr. Gonzalez observed reduced joint mobility and "remarkable pain the area," along with "somewhat flattened lordosis" and "tenderness." Id. Plaintiff's reflexes and gait were normal. Id.

Plaintiff reported to Dr. Sheehan on April 27, 2015, that she had localized pain in her neck and back, rated an 8 out of 10 in intensity. AR at 946. Dr. Sheehan observed that plaintiff had a decreased range of motion in her neck and back. Id. Dr. Sheehan ordered MRIs and noted that plaintiff asked for assistance with tobacco use cessation. AR at 948. A month later, on May 27, 2015, plaintiff saw Dr. Sheehan again, where she stated that she had

15

consistent, moderate pain in her upper back. AR at 950. Again, Dr. Sheehan found that plaintiff had a decreased range of motion in her neck forward flexion and back flexion. AR at 952. He referred her to a neurosurgeon. Id.

Plaintiff called to cancel her next appointment, and then saw Dr. Sheehan on August 5, 2015. AR at 954. She reported the pain in her back was a 7 out of 10. Id. The psychiatric exam was normal, but Dr. Sheehan diagnosed plaintiff with low back pain, insomnia, hidradenitis suppurativa, and vaginitis. AR at 956.

Plaintiff had an MRI on May 20, 2015. AR at 957. The MRI revealed that plaintiff had an asymmetric disc bulging to the right at C3-C4 and C4-C5, resulting in "mild central [] canal stenosis, slight impingement of the right anterolateral aspect of the [] cervical cord, and moderate right foraminal encroachment." Id. There was also mild right foraminal encroachment but no significant stenosis. Id. The remaining discs, vertebrae, cervical cord, joints, and tissues were normal and unremarkable. Id. Her thoracic spine was normal, but the MRI revealed a Chiari malformation (structural defect in the cerebellum) and a calcified cyst. Id. The MRI showed mild chronic L1 compression deformity and degenerative changes resulting in mild canal stenosis at L3-L4 and L4-L5.

Plaintiff again saw Dr. Sheehan on October 5, 2015. He noted that plaintiff's MRI "shows spinal stenosis and foraminal stenosis

16

cervical and lumbar spine. Mild to moderate." AR at 959. Upon examination, plaintiff appeared to be alert and oriented. Id. Dr. Sheehan again assessed plaintiff for back pain and referred plaintiff to a neurosurgeon (although he noted that other doctors had refused to perform surgery on plaintiff). AR at 960. Plaintiff's back pain was not discussed at length in a progress report from Rebecca Fears, NP, on October 6, 2015. AR at 961-62.

Dr. Sheehan filled out a questionnaire for plaintiff on January 22, 2016. He identified that plaintiff had back pain and neck pain and then wrote, "MRI," but the rest is illegible. AR at 943. Dr. Sheehan noted that these conditions (or the medications for these conditions) would cause pain, fatigue, and diminished concentration. Id. He opined that plaintiff's conditions would require her to rest during the workday and would result in her being off task for more than 33 percent of the day. Id. Dr. Sheehan opined that plaintiff's conditions would also lead to her missing more than four days of work per month. AR at 944. He further opined that plaintiff could sit for 3 hours per work day, stand or walk 1 hour per work day, would need to change positions every 15 minutes, and could occasionally lift up to 5 pounds but should never lift more. Id.

17

## Hearing Testimony

Testimony of Plaintiff at February 7, 2013 Hearing: On February 7, 2013, a hearing was held before ALJ John P. Ramos. AR at 36—59. Plaintiff testified that she was twenty-seven years old at the time of the hearing, married, had a ten-year-old daughter, and had graduated from high school. AR at 41—42. Plaintiff was last employed in 2011 with a cleaning service, and before that she worked as a restaurant manager. AR at 42. She had also worked as a personal care aide and a housekeeper. AR at 43. In June 2011, plaintiff was in a car accident, and she had not worked since then. AR at 43—44. Plaintiff testified that in the accident she had broken a back bone and a neck bone, and as a result, she could not run, play with her daughter, or drive, and she had high anxiety and depression. AR at 44. When describing her pain, plaintiff stated that she had "excruciating" pain, which she felt in her lower back, upper back, legs, feet, hands, and neck, for thirteen hours per day. AR at 44—45. Plaintiff described that she had MRIs and CT scans performed, and she had seen a chiropractor, a pain management doctor, and a neurosurgeon. AR at 45. She was taking Flexeril, Percocet, and Lyrica for back pain, which caused her memory loss, slurred words, loss of focus, and dry mouth. AR at 45-46. Plaintiff wore a neck brace and back brace after the accident. AR at 58. On a typical day, plaintiff wakes up to help

18

her daughter get ready for school, does the dishes, and vacuums, and she has had problems and assistance with her personal hygiene needs. AR at 46—47.

Plaintiff testified that she could remain seated for a maximum of a half hour before she would feel pain, then she would "walk back and forth" to try to make the pain go away. AR at 47. Plaintiff estimated that she could stand for twenty to thirty minutes before feeling pain, then she would take medicine, sit back down, or go to the bath tub. Id. Plaintiff stated that she lays down "mostly the whole day, but especially half of it." AR at 48. Because of her pain, plaintiff felt depression and anxiety and did not "go out," although she would leave the house a few times a week. AR at 48-50. Plaintiff could not maintain focus and had problems slurring her words, and she estimated that she could lift no more than ten to fifteen pounds. AR at 49—50. Plaintiff stated that in a week, she would "have four to five bad days where I just wake up and [the pain is] just [i]ntolerable." AR at 50.

Testimony of Plaintiff at March 15, 2016 Hearing: Plaintiff and her husband separated, causing her to lose her insurance and get a new doctor. AR at 698-701. Plaintiff testified that she began seeing Dr. Sheehan in April 2015. AR at 701. For a period of time between when her husband left and when she began seeing Dr. Sheehan, plaintiff was not medicated. Id. Dr. Sheehan would

19

not allow her to return to work. AR at 694. Plaintiff stated that she takes Percocet and Flexirol for her pain management, Paxil for anxiety and depression, and Ambien for sleep. AR at 696. According to plaintiff, since her last hearing, she has developed muscle spasms and fluid buildup in the back as well as tingling in the fingers, toes, and legs. AR at 697.

Plaintiff testified that, otherwise, things have stayed largely the same since the last hearing. AR at 699. She reported that she tries not to lift anything that is over between five and ten pounds. Id. Plaintiff indicated that her pain is intolerable between four and five days per week and her daily activities are "[c]ompletely diminished." AR at 701. On such days, plaintiff's mother would come in with her own key and "takes care of everything [she] needs," including cooking and taking care of her daughter, and bringing plaintiff to the bathroom. AR at 701-02.

Testimony of Vocational Expert at March 15, 2016 Hearing: The VE characterized plaintiff's previous employment as follows: (1) manager food service, DOT number 187.167-106, with a specific vocational preparation ("SVP") of 5, and light exertional level; and (2) cleaner, housekeeping, DOT number 323.687.014, with an SVP of 2 or unskilled, and light exertional level. AR at 706-07.

The ALJ asked the VE to consider an exertional level in the sedentary range. The VE indicated that such an exertional range would rule out plaintiff's previous employment. AR at 707. The

20

ALJ then asked whether there would be any unskilled jobs for an individual with a residual functional capacity ("RFC") to lift, carry, push and/or pull ten pounds occasionally and less than ten pounds frequently; stand and/or walk in any combination for a total of two hours in an eight-hour day; sit for six hours in an eight-hour day; occasionally climb, balance, stoop, kneel, crouch, crawl, and reach overhead; understand and follow simple instructions and directions; perform and maintain attention and concentration for simple tasks; regularly attend to a routine and schedule; appropriately relate and interact with others; carry our simple tasks; and handle stress related to simple tasks that do not require the management of others. AR at 707-08.

The VE responded that such an individual could perform work as (1) a final assembler, DOT number 713.687-018, with an SVP of 2 or unskilled, and a sedentary exertional level; (2) a ticket taker, DOT number 219.587-010, with an SVP of 4 or unskilled, and a sedentary exertional level; or (3) a document preparer, DOT number 249.587-018, with an SVP of two or unskilled, and a sedentary exertional level. AR at 709. According to the VE, there are sufficient numbers of these jobs in the national economy.

The ALJ then questioned the VE about possible absences. The VE testified that the above jobs would likely have a 90-day probationary period, during which no absences would be allowed. AR at 709-10. After that period, employers would tolerate no more

21

than one absence per month, and no more than 10-15 percent of the time off task. AR at 710.

Plaintiff's attorney asked the VE whether there would be any available jobs if an individual could sit three hours per day, stand and/or walk a total of one hour, and lift up to five pounds occasionally. AR at 711. The VE testified that such an arrangement would not be full-time, and therefore would not be competitive employment. AR at 711. The VE also testified that if an individual would be off task 20-33 percent of the time, she would rule out all work. AR at 711-12.

## Determining Disability Under the Social Security Act

The Evaluation Process: The Social Security Act provides that a claimant will be deemed to be disabled "if [s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving her case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore

23

v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2). When evaluating the severity of mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265—66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine

24

whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: At the first step, the ALJ determined that plaintiff had not engaged in substantial gainful activity since June 24, 2011, the alleged onset date. AR at 662. At the second step, the ALJ found that plaintiff had the following severe impairments: cervical and lumbar degenerative disc disease, adjustment disorder, anxiety, and cannabis abuse. Id. The ALJ found at the third step that none of these severe impairments or a combination of the impairments met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR at 663.

At the fourth step, the ALJ determined that plaintiff had the RFC to perform sedentary work, except that she could lift, carry, push, and/or pull ten pounds occasionally and less than ten pounds frequently. The ALJ found that plaintiff could stand and/or walk for two hours in a workday and sit for six hours in a workday, and could occasionally climb, balance, stoop, kneel, crouch, and crawl, and frequently reach overhead. AR at 664. According to

25

the assigned RFC, plaintiff could understand and follow simple directions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a routine and schedule, appropriately relate to and interact with others, and handle work-related stress. Id. The ALJ found that plaintiff's impairments could reasonably be expected to produce plaintiff's pain or symptoms, but that some of plaintiff's testimony was inconsistent with the record. AR at 665.

In rendering the RFC, the ALJ gave "significant weight" to Dr. Persaud's conclusion that plaintiff had "no restrictions for sitting, standing, [and] reaching," mild restrictions for walking on uneven terrain, and moderate to marked limitation for squatting, kneeling, crawling, lifting, carrying, pushing, and pulling. AR at 666. The ALJ found Dr. Persaud's findings to be generally consistent with a sedentary level of exertion. However, the ALJ did not adopt Dr. Persaud's opinion regarding nonexertional limitations because he found that the medical evidence did not support it. Id. "Specifically, physical examinations revealed reduced range of motion of the cervical and lumbar spine that would cause some postural limitations, but not to the extent opined by Dr. Persaud." Id.

The ALJ assigned "some weight" to the opinion of Dr. Povanda in November 2012 that plaintiff could lift five fifty pounds occasionally and ten pounds frequently, sit for two hours at a

26

time or for a total of four hours, could stand for one hour at a time for a total of two hours, and could walk for one hour at a time for a total of two hours. AR at 667. The ALJ did not, however, credit Dr. Povanda's later, more restrictive opinions regarding plaintiff's limitations. The ALJ stated that "many of the limitations described are not supported by the objective evidence." Id. Specifically, Dr. Povanda's opinions regarding plaintiff's sitting and postural limitations were inconsistent with imaging. Id. The ALJ stated that plaintiff's cervical and lumbar spine impairments would limit her ability to frequently lift overhead. Id. The ALJ did not, however, credit Dr. Povanda's later opinion regarding plaintiff's need to rest or her anticipated absences "since they are not consistent with her reported level of daily functioning." AR at 668.

The ALJ accorded "little weight" to the opinion of plaintiff's treating physician, Dr. Sheehan. AR at 668. Dr. Sheehan opined that plaintiff would be off-task more than 33 percent of the day and absent more than 4 days per month. Id. Further, he opined that plaintiff could sit for three hours and stand or walk for a total of one hour per workday, and that she could occasionally lift up to five pounds. Id. In discrediting this opinion, the ALJ noted that Dr. Sheehan's opinion was "merely a checkbox form without adequate narrative explanation." Id. Further, the ALJ believed that Dr. Sheehan's opinion was inconsistent with the

27

imaging he ordered. Id. Moreover, the ALJ noted that Dr. Sheehan's finding that plaintiff had a normal gait was consistent with the RFC's limitation to sedentary work. Id. Finally, the ALJ did not credit Dr. Sheehan's opinion that plaintiff would be off-task since such a finding was inconsistent with plaintiff's reported level of daily functioning. Id.

The ALJ gave "some weight" to consultative examiner Dr. Long's opinion that plaintiff would have few psychological limitations. The ALJ determined that such a finding was inconsistent with the treatment records and that "claimant is more limited than Dr. Long opined." AR at 669. However, the ALJ concluded that limiting plaintiff to simple work would account for plaintiff's mental limitations. Id. The ALJ also afforded "little weight" to state agency psychologist Dr. Harding's opinion that plaintiff did not have a medically determinable impairment. AR at 670.

At Step Five, the ALJ determined that plaintiff was not able to perform any past relevant work, but that there were jobs in significant numbers in the national economy that plaintiff could perform. AR at 671.

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault

v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012).
Rather, so long as a review of the administrative record confirms
that "there is substantial evidence supporting the Commissioner's
decision," and "the Commissioner applied the correct legal
standard," the Commissioner's determination should not be
disturbed. Acierno v. Barnhart, 475 F.3d 77, 80–81 (2d Cir. 2007).
"Substantial evidence is more than a mere scintilla.  It means
such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  Brault, 683 F.3d at 447–48
(internal citation and quotation marks omitted).  "Even where the
administrative record may also adequately support contrary
findings on particular issues, the ALJ's factual findings must be
given conclusive effect so long as they are supported by
substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir.
2010) (internal quotations omitted).

     This deferential standard of review does not mean, however,
that the Court should simply "rubber stamp" the Commissioner's
determination.  "Even when a claimant is represented by counsel,
it is the well-established rule in our circuit 'that the social
security ALJ, unlike a judge in a trial, must on behalf of all
claimants [] affirmatively develop the record in light of the
essentially non-adversarial nature of a benefits proceeding.'"
Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting another
source); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999)

("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff is a young woman with a high school education who was hospitalized with significant back and neck injuries resulting from a motor vehicle accident on June 24, 2011. She has not been

able to work since the accident. Her treating physicians rendered medical opinions regarding her injuries and limitations that, if credited by the ALJ, would result in a finding of disability. At the conclusion of a very brief video-hearing held on March 15, 2016, the ALJ told plaintiff that the issues were "pretty straightforward" and asked the plaintiff's attorney: "I assuming [sic] you would want me to adapt [sic] the limitations set forth by the treating physicians in their medical source statements?" The attorney responded "Yes, sir. I would. Yes." AR at 712. A few weeks later, the ALJ issued his decision rejecting the treating physician findings and determining that the plaintiff was capable of performing sedentary work. For the reasons that follow, the ALJ's decision was not supported by substantial evidence.

Plaintiff advances a number of arguments,[3] but they all boil down to whether the ALJ was justified in rejecting the clear and unequivocal opinions of plaintiff's two treating doctors, Dr. Povanda and Dr. Sheehan. The treating physician rule, set forth in the Commissioner's own regulations, "mandates that the medical opinion of a claimant's treating physician is given controlling

---

[3] As set forth in her brief, plaintiff argues that (1) the ALJ's finding that plaintiff could perform the sitting and standing requirements of sedentary work was erroneous because (a) plaintiff cannot meet the sitting demands of sedentary work and (b) the ALJ failed to consider the need to change positions; (2) the ALJ did not properly consider plaintiff's pain; (3) plaintiff was unable to maintain regular attendance or acceptable levels of work pace; and (4) the ALJ improperly relied on the testimony of the VE. Pl.'s Br. (Docket # 10-1), at 9-20.

weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); see 20 C.F.R. § 416.927(d)(2) ("Generally, we give more weight to medical opinions from your treating sources."). Where, as here, an ALJ gives a treating physician opinion something less than "controlling weight," he must provide good reasons for doing so. Our circuit has consistently instructed that the failure to provide good reasons for not crediting the opinion of a plaintiff's treating physician is error. See Schaal v. Apfel, 134 F.3d 496, 503-05 (2d Cir. 1998); see also Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) (per curiam) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) ("The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant.").

Our circuit has also been blunt on what an ALJ must do when deciding not to give controlling weight to a treating physician:

> To override the opinion of the treating physician, we have held that the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of

32

treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist. . . . After considering the above factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion. . . . The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand. . . . The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion.

Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (emphasis added) (internal citations, quotations and alterations omitted). Because the ALJ failed to set forth comprehensive reasons for rejecting plaintiff's treating physicians' opinions here, the denial of benefits was not supported by substantial evidence.

Dr. Paul Povanda: Dr. Povanda provided three written medical source statements to assist the Commissioner in determining disability. In November 2012, he opined that plaintiff's compression fractures at L1 and C1 would limit her to standing for two hours and sitting for only four hours in an eight hour work day. AR at 502. In a disability questionnaire dated February 5, 2013, Dr. Povanda opined that plaintiff could not do sedentary work on a sustained basis, would need more than one ten-minute rest period per hour, and that her medical condition would result in frequent absences from work (four or more per month). AR at 607. Plaintiff's medications at the time included Lyrica, Fentanyl, Percocet and Flexeril. AR at 621. Several months later,

on May 30, 2013, Dr. Povanda reported that plaintiff would need "complete freedom to rest frequently without restriction" while at work and if she attempted sedentary work on a sustained basis she "would have substantial absences from work," meaning at least four days per month. AR at 623-24.

There is no dispute that, if credited, these limitations as expressed by Dr. Povanda would require a finding of disability. The ALJ gave "some weight" to the November opinion and did not credit or adopt any of the other opinions. In discounting the opinions of the treating physician, the ALJ did not engage in the critical analysis and explanation required by the Second Circuit as set forth in Greek v. Colvin, 802 F.3d 370. Indeed, the ALJ seemed to do what is specifically prohibited – "substitute his own expertise or view of the medical proof for the treating physician's opinion." Id. For example, the ALJ did not give weight to Dr. Povanda's opinions because, he said, "many of the limitations described are not supported by the objective evidence." AR at 667. According to the ALJ, Dr. Povanda's opinions regarding plaintiff's sitting limitations were inconsistent with "her minimal imaging findings and examinations showing normal strength, sensation and motor functioning throughout her upper and lower extremities." Id. The ALJ's description of imaging findings as "minimal" is difficult to comprehend since the imaging findings documented "a non-displaced fracture in the posterior of C1 on the

34

left side" and "a mild superior end plate fracture at L1 anteriorly without retropulsion." AR at 297. More disturbing is that the examination the ALJ credited over plaintiff's treating physicians was a one-time consultative examination done five years earlier and apparently completed without the benefit of any other medical records other than perhaps a single CT scan from June 2011. AR at 368.

In April 2012, plaintiff was examined at the Southern New York's neurosurgery clinic and was found to be "in significant distress" with "any movement of the spine [causing] severe pain." AR at 360. The examiner noted plaintiff "can hardly walk." Id. At that time, plaintiff was taking Morphine, Neurontin, Percocet and Flexeril for pain. Id. Plaintiff's repeated visits to her treating physicians and other specialists, as well as her own testimony and prescribed medications certainly cast a skeptical cloud over the ALJ's sanguine finding that he was rejecting a treating physician's opinions because plaintiff's examinations showed "normal strength, sensation and motor functioning throughout her upper and lower extremities." AR at 667.

Dr. M. Richard Sheehan: Dr. Sheehan is a Board Certified physician who has been plaintiff's primary treating doctor for several years. On January 22, 2016, he provided a written opinion questionnaire to assist the Commissioner in determining disability. Dr. Sheehan's opinion was remarkably consistent with

35

the opinion of plaintiff's other treating physician, Dr. Povanda.
Dr. Sheehan opined that plaintiff's back condition and spinal
stenosis would cause pain and fatigue and that the medications she
was taking would diminish both her pace of work and her ability to
concentrate at work. AR at 943. As a result, in Dr. Sheehan's
opinion, plaintiff would be off task for more than thirty-three
percent of a work day. He also stated that plaintiff's conditions
would lead to her missing more than four days of work per month.
AR at 944.

Again, there is no dispute that if credited, these limitations
as expressed by Dr. Sheehan would require a finding of disability.
The ALJ did not adopt these findings, however, and assigned them
"little weight." AR at 668. As with Dr. Povanda, in discounting
the opinions of Dr. Sheehan, the ALJ did not engage in the critical
analysis and explanation required by Greek. While conceding that
Dr. Sheehan "personally treated" plaintiff, the ALJ decided that
his opinion was entitled to "little weight" because much of Dr.
Sheehan's opinions were expressed by "merely a checkbox" without
"an adequate narrative explanation with reference to clinical and
diagnostic findings." AR at 668.

It is true that Dr. Sheehan's opinion was in the form of a
check-box questionnaire. But the use of questionnaires or forms
is not unique in disability determination assessments. Although
not necessary here, this Court could take judicial notice of the

36

fact that when a relevant opinion or assessment "box" is checked by a medical professional and the checked finding supports the ALJ's determination, the Commissioner has no hesitancy in relying on that "checked" finding in arguing to the Court that the claimant is not disabled. The usefulness of a checked box is a function of whether the opinion expressed is relevant to the determination of disability and what information the provider relied upon in deciding what box to "check." See Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) ("The relevant question is not whether the ALJ, on a personal level, considers this method of evaluation deficient, but rather whether there exists a principled reason to reject it.").

Here, Dr. Sheehan was plaintiff's treating physician for several years and personally examined plaintiff on many occasions. Indeed, in evaluating plaintiff, Dr. Sheehan – or professionals in his office – ordered multiple tests prior to rendering their opinion. See AR at 946, 952, 953, 951, 961. The findings of each of those office visits and test results are memorialized in narrative form and are part of the record. And those visits necessarily formed the basis of – and supported - Dr. Sheehan's medical opinions to which the ALJ assigned only "little weight." In the context of a busy treating physician who has seen a claimant multiple times and who maintains office notes and test results to support the opinions expressed, the use of a checked box format is

hardly surprising and certainly not disqualifying. Moreover, if the ALJ felt the form lacked sufficient "narrative", he should have contacted Dr. Sheehan and requested additional information. See Schaal, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from Dr. Jobson *sua sponte*."); see also Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("[T]he ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel.").

Trying to justify the rejection of Dr. Sheehan's otherwise relevant opinion based on the form on which it was rendered was error. See Merritt v. Comm'r of Soc. Sec., No. 15-CV-6633-CJS, 2016 WL 6246436, at *8 (W.D.N.Y. Oct. 26, 2016) ("Notwithstanding the lack of narrative on the check-box form, the ALJ was still required to consider the opinion" where "[s]ignificant treatment notes exist"). "[T]here is no authority that a 'check-the-box' form is any less reliable than any other type of form; indeed, agency physicians routinely use these types of forms to assess the intensity, persistence, or limiting effects of impairments." Trevizo v. Berryhill, No. 15-16277, 2017 WL 4053751, at *8 n.4 (9th Cir. Sept. 14, 2017); see Marshall v. Astrue, No. C11-1236-JCC-BAT, 2012 WL 2062351, at *2 (W.D. Wash. May 15, 2012), report and recommendation adopted, No. C11-1236-JCC, 2012 WL 2061607 (W.D. Wash. June 7, 2012) ("The use of a 'check-box form,' alone,

is not grounds to reject the doctor's opinions. Medical opinions contained in check-box forms are a common feature of social security disability cases. Sometimes the Commissioner relies on opinions in "check-box forms" to reject a claimant's application, and sometimes not."); Sobery v. Astrue, No. 4:07CV0897 AGF, 2008 WL 4332291, at *14 (E.D. Mo. Sept. 17, 2008) ("The fact that most of Dr. Tayob's RFC assessment was almost entirely recorded on a check-box form does not justify discounting it.").

Finally, pain can be disabling. The record is replete with references to plaintiff's continued struggles with pain. Her high level of pain since the automobile accident is noted on virtually every medical examination and report in the record and is confirmed by the powerful pain medications prescribed by her treating medical providers. See Cahill v. Colvin, No. 12 CIV. 9445 PAE MHD, 2014 WL 7392895, at *24 (S.D.N.Y. Dec. 29, 2014) ("All the evidence we can glean from the record—including plaintiff's own consistent testimony, treating physicians' records, diagnostic imaging and other testing, and prescriptions for pain medications—supports the credibility of [plaintiff's] history of pain and his claims that the pain is incapacitating."). Yet, the ALJ rejected the plaintiff's complaints of pain in boilerplate fashion:

> "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms; however, the claimant's statements concerning the intensity,

39

persistence and limiting effects of these symptoms are
not entirely consistent with the medical evidence and
the other evidence in the record for the reasons
explained in this decision."

AR at 670.    This boilerplate language has been criticized as
meaningless.    See Cahill, 2014 WL 7392895, at *22.

More specificity is required to meet the substantial evidence
standard.    "If the ALJ decides to reject subjective testimony
concerning pain and other symptoms, he must do so explicitly and
with sufficient specificity to enable the Court to decide whether
there are legitimate reasons for the ALJ's disbelief and whether
his determination is supported by substantial evidence." Brandon
v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (citing Valente v.
Sec'y of Health and Human Servs., 733 F.2d 1037, 1045 (2d Cir.
1984) (other citations and footnote omitted)).    Here, the ALJ
provided no meaningful analysis of why plaintiff's allegations of
persistent pain were "not entirely consistent" with the medical
evidence.    What specific medical evidence is the ALJ relying on to
demonstrate that plaintiff's complaints of debilitating pain are
not credible?    On review, this Court is only left to guess, and
that is error and unfair to plaintiff.

## Conclusion

The ALJ erred in not giving controlling weight to the
opinions of plaintiff's two treating physicians.    There is no

dispute that those opinions, if credited, and if considered in light of the testimony of the vocational expert, would require a finding of disability. In addition, the ALJ's determination that plaintiff's complaints of debilitating pain were not credible was not supported by substantial evidence. The record in this case confirms that plaintiff is disabled. For these reasons, plaintiff's motion for consideration of precedent (Docket # 20) is **granted**, plaintiff's motion for judgment on the pleadings (Docket # 10) is **granted**, the Commissioner's motion for judgment on the pleadings (Docket # 17) is **denied**, and the case is remanded to the Commissioner for calculation and payment of benefits.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     September 29, 2017
           Rochester, New York